# Pollak *v*. Janney & Cheney, Trustees, &c.

|100   561|
|113   377|
|113   382|

*Bill to Enforce a Trust in Personal Property.*

1. *Transfer of collaterals.*—Under Code 1886, § 1784, a transfer and delivery of collaterals, by the holder thereof, unaccompanied by a transfer of the debt secured by the collatera's, operates as a discharge of the hypothecation and has the effect of restoring the right and title of the owner.

2. *Same.*—Such a transfer of collaterals, however, is not utterly void, but the original owner is armed by the statute (Code 1784) with an election to affirm or disaffirm the transfer; if he repudiates it, he has the right to recover the securities; if he confirms the transfer, the title to the securities is thereby vested in the transferree as fully as if the transfer were originally authorized, or as if it had been made accompanied by a transfer of the debt secured by such collateral.

3. *Same; case at bar.*—Where C. executed to P. certain notes, payable to the latter's order, and secured by collaterals, under an agreement to raise certain money thereon, and pay certain indebtedness of C., and in case of failure to secure the money to return the notes and collaterals and P. having failed to raise the money, M. Bros., without the knowledge of C., paid his debt under an agreement with P. that he would deliver to them such collaterals. which arrangement was afterwards ratified by C., but P. refused to deliver the collaterals, the rights of C. in such collaterals passed to M. Bros.

4. *Remedy in equity for unauthorized transfer of collaterals.*—In such case P. originally held such collaterals in trust for C., and by his agreement with M. Bros., ratified by C., he became their trustee, to whom or their assignees equity will compel him to transfer such securities, and not leave them to pursue their remedy at law.

APPEAL from the Chancery Court of Montgomery.

Heard before Hon. JOHN A. FOSTER.

The bill in this case was filed by Janney & Cheney, as trustees of the Moses Bros. estate (under a deed of assignment) against I. Pollak and others. The appeal is prosecuted from a decree overruling the demurrers interposed by the defendants and their motion to dismiss the bill for want of equity.

All the facts are sufficiently stated in the opinion.

36

[Pollak v. Janney & Cheney, Trustees, &c.]

The demurrer set forth in various special assignments the want of equity in the bill.

ROQUEMORE, WHITE & DENT, for the appellant, cited the following authorities:—Code, § 1784; 20 Amer. & Eng. Ency. of Law, p. 726, and note 2; *Dow v. Holland*, 8 Cow. (N. Y.) 277; *Gilbert v. Sharp*, 2 Lans. (N. Y.) 412; *Jones v. Newhall*, 115 Mass. 244; *Cushman v. Thayer M'f'g. Co.*, 77 N. Y. 365; 123 Mass. 286; and elaborated the following propositions: Pollak's possession of the Chambers collaterals was governed, so far as the right to separate and transfer them is concerned, by the provisions of our statute.—Code, § 1784. Moses Bros. were strangers and volunteers when they contracted to obtain and receive these collaterals from Pollak. The agreement was in direct contravention of the statute, and was void. Chambers' assent that the status should be as Pollak and Moses Bros. had agreed upon was valid within itself, and was the inception of Moses Bros. rights in the stocks. After and upon this assent, Moses Bros. rights existed independent of Pollak's promise. The assent did not relate back, because, (1) the antecedent act was not Chambers', (2) it was void, and (3) it was unauthorized. Pollak was only the bailee of Chambers after his debt was paid, or after the contract with Moses Bros. to separate and transfer his collaterals, and not a trustee for Moses Bros. He at no time occupied a trust relation to Moses Bros. in reference to these stocks although he may have towards Chambers. Pollak's duty to Moses Bros., if it arose out of his agreement with them (which we deny) was a mere simple promise, for the breach of which case afforded a full, complete and adequate remedy. If the duty existed only after Chambers' assent, which we contend, it was a duty of the bailee of Chambers, and no trust existed.

TOMPKINS & TROY, and HORACE STRINGFELLOW, for the appellees.—The bill avers that section 1784, of the Code of Ala. in reference to the transfer of securities can have no application to this case. First, because it appears from the bill that the debt which the collaterals were given to secure, was not created until Pollak negotiated the loan for Chambers with Moses Bros. and the stock was agreed to be delivered to Moses Bros. because as Chambers' creditors for said loan, they were entitled to it under the terms of the agreement. Second, because if Pollak was a creditor of Chambers and held the stock as security for such debt, it was the debt that was transferred by Pollak, not the securi-

[Pollak v. Janney & Cheney, Trustees, &c.]

ties ; they have never been transferred, and Pollak's failure
to transfer is the cause of our complaint.   Under the terms
of said section of the Code, if the debt was transferred, the
transfer passed to Moses Bros. the right of Pollak in the
property pledged.   It can not be said on the one hand that
no debt from Chambers to Moses Bros. was created by their
payment of his portion of said indebtedness upon the faith
of the securities for the same, or on the other (if Pollak be
considered a creditor) that he did not transfer Chambers'
debt to him to Moses Bros., for the bill states that Chambers
was afterwards informed of the transaction and acknowl-
edged his indebtedness to Moses Bros. for said advances for
him, and admitted their right to the collaterals as asserted
by them.   Independent of the matters hereinabove consid-
ered, complainants are entitled to relief, because it is averred·
in the bill that the value of the stocks described therein is
not easily ascertainable.   Ordinarily a court of equity will
not decree a specific performamance of a contract in reference
to personal property, unless it appears that on account of the
nature of the contract or the character of the subject-matter,
or for other causes a court of law is incapable of affording
full and adequate compensation in damages for the breach
of the contract.—*Dilburn v. Youngblood*, 85 Ala. 450; 1 Story's
Equity Jur. sec. 33; *Moses v. Scott*, 84 Ala. 611; Waterman
on Specific Performance, § 19.   How can the remedy at law
be adequate if the value of the stocks, the subject of the
contract sought to be enforced, is largely speculative or not
easily ascertainable?   In such cases specific performance
has been often decreed, upon the ground of inadequacy of
remedy at law.—Cook on Stock and Stockholders, §§ 337,
and 338.   Upon the averments of the bill it is clear that the
remedy of complainants in a court of law is inadequate, and
upon this ground alone, the bill should be sustained.   Again,
appellant having agreed to deliver the stock to Moses Bros.
if they would pay or advance Chambers' portion of said
loan, and stated that by such payment they would become
entitled to the stock to secure the re-payment of the same
to them can not now be allowed to claim the stock for him-
self under an independent agreement with Chambers.

McCLELLAN, J.—It appears from the contract executed
by Moses Bros. and W. L. Chambers, severally on the one
hand, and Ignatius Pollak, of January 3rd, 1888, that these
parties, together with one Altmeyer, had some time before
that made a purchase of lands which they call the "Cull-
man purchase."   The agreement was, as between themselves,

that each of the parties named should pay a certain part of the purchase-money, but what each contribution should be, whether each should pay the same or different sums, does not appear, nor does it appear whether they were jointly liable to the vendor for the whole purchase-money, or severally liable each to the extent of the contribution agreed on among themselves; but on the facts shown the presumption would be, perhaps, that they were jointly liable in gross, or, at least, that the land itself was subject to a lien in gross, for the whole purchase-money. Pollak and Altmeyer, before January, 1888, had fully paid their respective proportions of the land debt. The balance then unpaid thereon was $82,000, maturing February, 12, 1888, of which Moses Bros. were to pay $61,500, and Chambers was to pay $20,500. For the purpose of raising necessary funds to make these payments, the agreement of January, 1888, above referred to, was entered into. It is as follows: "This agreement made this, the 3d day of January, 1888, by and between Ignatius Pollak, Moses Bros. and W. L. Chambers, witnesseth: That for the purpose of enabling the said Pollak to negotiate loans for the other named parties amounting to $82,000 and interest at six per cent. *per annum* from the 10th of February, 1887,—$61,500 of which is for and on behalf of Moses Bros., and $20,500 of which is for and on behalf of W. L. Chambers,—the said Moses Bros. have executed their sixteen promissory notes, dated and payable four months after date to the order of Ignatius Pollak, as follows: fifteen notes for $4,000 each, and one note for $1,500; and to secure the same have transferred to and deposited with said Pollak certain collaterals, as shown by a separate receipt of even date herewith; and the said Chambers has executed his seven promissory notes, dated and payable four months after date, to the order of said Pollak as follows: six notes, $3,000 each, and one note $2,500; and to secure the same has transferred to and deposited with said Pollak certain collaterals, as shown by a receipt of even date herewith. It is understood that the said Pollak is to be unrestricted in the disposition of said notes, and is to use them all, if practicable, for the purpose of meeting certain notes aggregating $82,000 maturing one year from the 12th February, 1887. The said Pollak, however, obligates himself to provide for only $50,000 of said $82,000, and in event not more than $50,000 is provided for by said Pollak for the purpose aforesaid, he hereby agrees to return notes to Moses Bros. and W. L. Chambers amounting to $32,000, and also to return them collaterals in the same proportion. It is un-

VOL. C.

derstood and agreed between the parties hereto, that said Pollak and one A. R. Altmeyer do not owe any part of the said $82,000 of notes, they having heretofore advanced their *pro rata* of money towards meeting payments on the Cullman purchase." Notes were executed by Moses Bros. and Chambers, respectively, and the collaterals referred to were transferred and delivered by them respectively to Pollak, under and according to the terms of this agreement; and in pursuance thereof he, Pollak, used the notes of Moses Bros. for the purpose of raisiug said sum of $61,500 for them, and these notes were afterwards paid by Moses Bros. But Pollak did not use Chambers' notes to raise his share of said indebtedness, viz: $20,500, nor did he raise that sum or any part of it for Chambers, and the latter has never paid said notes, or any part thereof. To the contrary, the $20,500 which was to be raised by Pollak for Chambers, with Chambers' said notes and collaterals, was paid by Moses Bros. to Pollak for Chambers, on or before February 13, 1888, with the understanding and agreement between Pollak and Moses Bros. that they, Moses Bros. should by reason of such payment become entitled to the collaterals deposited by Chambers with Pollak, and that the latter would forthwith deliver the same to Moses Bros., to be held by them to secure the repayment by Chambers to them of the sum so advanced and paid to Pollak for Chambers.

This payment by Moses Bros. to Pollak for Chambers was made without the request or knowledge of the latter, as was also the agreement for the delivery of the collaterals by Pollak to Moses Bros. Upou subsequent information of such advance or payment for him, however, Chambers ratified and comfirmed the same, and admitted the right of Moses Bros. to the collaterals as asserted by them. The collaterals were not delivered by Pollak to Moses Bros. at the time of said payment, and have never been so delivered, but are still in the hands of Pollak, who now asserts a right to retain them as security for an indebtedness of Chambers to him, and refuses to surrender them according to said agreement. Chambers has never paid Moses Bros. the money thus advanced, and their claim therefor, as also their rights and remedies in the premises against Pollak, growing out of his failure to deliver the collaterals to them, have passed to and are now vested in the present complainants, Janney & Cheney, through a general assignment by Moses Bros. for the benefit of creditors.

Upon the foregoing facts this bill is filed. It contains a description of the Chambers collaterals, and an averment

that "by said payments to said Pollak for the said Chambers, and by virtue of said agreement and understanding of said Moses Bros. with said Pollak, [with reference to the delivery of the collaterals by Pollak to Moses Bros.], a trust was fastened upon said collaterals in favor of the said Moses Bros., and that the said Pollak thereafter held the said collaterals as trustee for the said Moses Bros." And the prayer of the bill, so far as need be stated here, is, that Pollak be ordered to assign and surrender the collaterals, which consisted of shares in several incorporated companies, to the complainants; that said companies, which are made defendants, be ordered to transfer said stock on their books to the complainants, and that said collaterals be sold and the proceeds of the same be applied to the debts of said Chambers to Moses Bros. and the complainants as assignees &c., &c. There is reference in the bill and prayer to the right claimed by Pollak to retain the collaterals and apply them to some indebtedness of Chambers to him; and the prayer for a sale of the securities, &c., appears to be based on the alternative condition that the court shall find Pollak's claim to be well founded as between him and Chambers, and is that, in that event, the proceeds of sale, beyond what is necessary to pay the debt of Moses Bros., shall be applied to Pollak's debt against Chambers. There is also a prayer for such other, further and general relief as the facts of the case may require.

Demurrers were interposed by Pollak, and he also entered a motion to dismiss the bill for the want of equity. The demurrers and motion were overruled and denied; and from the decree to that effect this appeal is prosecuted.

All the questions now presented properly arise on the motion to dismiss the bill, and the assignments of demurrer need not be specially considered. The contentions of appellant are, that on the facts alleged no trust relation existed between Pollak and Moses Bros., with respect to this property, whereby a trust was fastened upon the collaterals in favor of the latter; that the subject-matter of the alleged agreement between Moses Bros. and Pollak being personalty, and not held in trust by Pollak for Moses Bros., specific performance of that agreement to deliver the collaterals can not be decreed; and that, Pollak being solvent, the complainants have a plain, adequate and complete remedy at law for the redress of Pollak's wrong in withholding said collaterals.

It is not contended, and can not be successfully, that Moses Bros. acquired any title or equity to or in Chambers'

collaterals, under the contract of January 3, 1888, or by rea-
son of what was done by Pollak in the execution of that con-
tract. The duties and obligations of Pollak, under that in-
strument, were several in respect to Moses Bros. and Cham-
bers. He took upon himself to raise, if practicable, $20,500
for Chambers and on Chambers' notes and collaterals, as a
matter wholly apart from a like undertaking to raise $61,500
for Moses Bros. on their notes and collaterals. He was not
to use the notes and securities of either of these parties to
provide a fund for the payment of the others' share of the
$82,000 indebtedness. He undertook absolutely to raise
$50,000 for this purpose, and in the event only that sum was
raised he was to return to Moses Bros. and Chambers re-
spectively their notes and collaterals in the proportion that
$32,000 the amount thereof not used by him bore to $82,000
the aggregate of the two sums he agreed to provide if prac-
ticable ; but it is manifest from the terms of the instrument,
and from the conduct of the parties evidencing a construc-
tion in fact of it, that this proportionate return of notes and
collaterals to Moses Bros. and Chambers respectively, was
contemplated and to be based on the raising of the $50,000
in part by the use of the papers of Moses Bros., and in other
part by the use of Chambers' notes and collaterals, and that
in the event the paper of either one of the parties could not
be so used in whole, or to any less extent, in providing
whatever sum should be raised less than $82,000, to that
extent there was a failure to provide funds for that party.
In other words, if by using a part of the papers of each only
$50,000, or any other sum less than the whole, was provided,
each of the parties was to be entitled to that part of the fund
borrowed on his or their securities, and if such part was
raised solely on the notes of one of the parties, it belonged
wholly to that party, because he alone was under obligation
to repay it, and all his notes and securities, having been
used and negotiated to evidence and secure his obligation,
could not be returned to him in any amount. All of Moses
Bros.' papers were thus negotiated, and none of Chambers';
their full share of the indebtedness was raised and applied,
but nothing was raised for Chambers. It was impossible
for Pollak, and he was under no obligation, to return any
part of Moses Bros. papers to them. He had used all of
them according to the terms of the contract, met his obliga-
tion to raise $50,000 and apply it to the debt of $82,000, and
was fully discharged from all duty and obligation to Moses
Bros. Whatever rights Moses Bros. have therefore against
Pollak, must arise entirely through Chambers, and the case

is to be considered as if Moses Bros. had not been parties to the contract of January 3, 1888, at all, since that contract was several, and has been fully executed as concerns them.

Taking hold of the transaction at this point, we have the following case: Pollak had notes of Chambers, secured by collaterals transferred and delivered to him, for the aggregate sum of $20,500. These notes had been executed payable to Pollak's order, to enable him through a negotiation and endorsement of them, and a transfer of the collaterals, to raise the sum stated and apply it to a certain indebtedness of Chambers, if it was practicable for the fund to be thus realized. It was found to be impracticable, the notes were never indorsed or negotiated, and they are still in Pollak's hands. Moved by considerations which are indicated in the present bill and exhibits, but upon which no stress need now be laid, Moses Bros. volunteered to advance for Chambers to Pollak the amount of Chambers' said indebtedness, to be applied in satisfaction by Pollak. This was not done at Chambers' request, or with his knowledge or assent. Neither was the advance made on consideration of an indorsement and transfer of Chambers' notes to Moses Bros. The notes were not, as we have seen, indorsed to Moses Bros. at all, and the bill negatives any contemplation that they should be. It was agreed, however, in consideration of this voluntary payment by Moses Bros. of Chambers' debt, that Pollak should transfer, assign and deliver Chambers' collaterals to Moses Bros.; but this agreement was between Moses Bros. and Pollak only, as has been said, not requested or assented to by Chambers, nor in consonance with any previous agreement between him and Pollak. Had Chambers' notes been efficaciously indorsed by Pollak to Moses Bros., the collaterals would have gone with them; but, under the influence of section 1784 of the Code, a transfer and delivery of the collaterals by Pollak to Moses Bros. unaccompanied by a transfer of the debt evidenced by Chambers' notes, would have been a discharge of the hypothecation, having the effect of restoring the right and title of Chambers. We do not think, however, that such a transfer of the collaterals would have been utterly void, certainly not in the sense of being incapable of efficient ratification by Chambers. To the contrary, we construe the statute to arm the person from whom the collaterals originally come, in such cases, with an election to affirm or disaffirm such a transfer. If he repudiates it, he, of course, has the right to recover the securities, the transfer having revested the title in him. But he equally has the right to confirm

VOL O,

[Pollak v. Janney & Cheney, Trustees, &c.]

this merely voidable transaction, and thereby invest title to the securities in the transferree, as efficiently for all purposes as had he authorized it in the first instance, or the transfer had been made along with the assignment of the debt the collaterals were intended to secure. Suppose, for example, that the alleged agreement of Pollak had been executed, and the collaterals had been transferred and delivered to Moses Bros. thereunder, and, further, that upon coming to a knowledge of the transaction, Chambers had ratified and confirmed it, and admitted Moses Bros.' right to the papers; could it be pretended that he could afterwards proceed either against Pollak for a breach of duty, or against Moses Bros. for the securities? We think not. The Code provision is intended purely for his benefit. He alone could, before the statute, have been prejudiced by the separation of his collaterals from his debt and the transfer of the former without the latter. Clearly he could *in limine* authorize this to be done. Clearly, also, after it has been done, he may waive the provision, and render the transaction entirely efficacious by a ratification of it. So, too, with respect to the *agreement* by Pollak *to transfer* the securities to Moses Bros. There was nothing in the relations presently existing between Pollak and Chambers out of which could be evolved authority on Pollak's part to enter into such arrangement. Yet, holding the collaterals for Chambers, the latter, of course, could have given such authority to Pollak, and had he instructed Pollak to agree to turn over the collaterals, without the notes, to Moses Bros., on the payment by them to Pollak of Chambers' indebtedness, it can not be doubted that whatever right Chambers had in the premises against Pollak would in equity have passed thereby into Moses Bros. Finding that Pollak, assuming to act for him, but without authorization to do the particular thing, had agreed to transfer and deliver the collaterals to Moses Bros., we conceive no reason why Chambers could not sanction, ratify and confirm this agreement of Pollak, and thereby adopt it and make it his own, to be effectuated through the holder of his collaterals. And we accordingly hold that, on the averments of the bill, whatever rights Chambers had against Pollak passed by the latter's agreement and the former's ratification thereof into Moses Bros.

And the sole question remaining on this part of the case is as to the character of the rights existing between Pollak and Chambers in relation to these securities, after the payment by Moses Bros. to Pollak of Chambers' share of the $82,000 indebtedness. Under the construction we have

placed on the contract of January 3, 1888, Pollak took both the possession and title of and in these collaterals upon alternate and successive obligations. Primarily, he was to hypothecate the collaterals to secure a loan of $20,500 evidenced by Chambers' notes aggregating that sum, to be endorsed to the lender, if it were found practicable to make the negotiation. Secondarily, the negotiation being found to be impracticable, and Pollak having failed to raise the loan, the alternate obligation became operative upon him, and it then became his duty to retransfer and redeliver the securities to Chambers. It was upon the faith and confidence that Pollak would do one of these things, if practicable, and the other, if the first could not be accomplished, that Chambers assigned and delivered the collaterals to him. These considerations, which the engagements of the parties fully sustain, bring the case, as between Pollak and Chambers, clearly within the definition of a trust, which is "an obligation upon a person arising out of a confidence reposed in him to apply property [legally vested in him] faithfully and according to such confidence;" or, as defined in other language, "a trust is in the nature of a deposition by which a proprietor transfers to another the property of the subject intrusted, not that it should remain with him, but that it should be applied to certain uses for the behoof of a third party;" or, we may add, for the behoof of the proprietor himself.—1 Perry on Trusts, § 2. One point of distinct differentiation between such a case and such other fiduciary relations as exist between principal and agent, bailor and bailee, and the like, lies in the fact that the legal title passes to and is invested in the trustee, and does not pass to the agent or bailee, and the confidence reposed in the former can therefore only be enforced in equity, while the duties incident to the latter relation, such as the surrender or redelivery of property held by an agent or bailee, can be enforced at law. Here, then, was the legal title and possession in Pollak upon trusts, and the equitable right in Chambers to have the trusts executed. The title and possession in Pollak only for the purpose of hypothecating the collaterals if he could, and if he could not, then for the purpose of revesting that title and redelivering that possession to Chambers. He failed of the first purpose. He thereupon was under an obligation, enforceable in equity, to carry out the second. Chambers manifestly, in our opinion, had a standing in equity after the first purpose had failed, to have a trust declared in his favor on these collaterals, and its execution enforced through a decree for transfer and delivery

[Tyson v. Chestnut.]

by Pollak to him. And this equitable right passed on the facts alleged into Moses Bros., and, through them, into the complainants.

The bill is, therefore, not merely one to enforce specific performance of a contract to transfer and deliver personalty, which chancery will not decree in the absence of special circumstances demonstrating the inadequacy of legal remedies, but there is superadded to the mere contract an element of confidence and faith reposed in the holder and leading to the investiture of the legal title in him, and which constitutes him a trustee whom equity will compel to pass that title according to the faith and confidence under which he received it, whether the subject-matter be personalty or realty.

The bill to this end had equity, and the Chancery Court did not err in overruling the demurrers of the respondent, Pollak, and denying his motion to dismiss.

Affirmed.